RECORD NO. 14-1904

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SHEE ATIKÁ LANGUAGES, LLC AND
THE SHEE ATIKÁ LANGUAGES, LLC, LIQUIDATING TRUST,

Plaintiffs–Appellants,

v.

GLOBAL LINGUIST SOLUTIONS, LLC,

Defendant–Appellee.

On Appeal from the United States District Court
for the Eastern District of Virginia,
No. 1:13-cv-00850-LMB/TRJ (Brinkema, J.)

THE SHEE ATIKÁ PLAINTIFFS' OPENING BRIEF

Michael J. Lockerby
Brian J. Kapatkin
Erik F. Benny
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, NW, Suite 600
Washington, DC 20007-5143
202.672.5300
202.672.5399 (fax)

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO

2.      Does party/amicus have any parent corporations?                     YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                     YES     NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES      NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      YES      NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                            YES      NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____            _____
        (signature)                                    (date)

# **TABLE OF CONTENTS**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.......................................i

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE...............................................................................3

I.     THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT
       DID NOT COMPORT WITH FEDERAL RULE 56 STANDARDS. ..........3

II.    THE DISTRICT COURT IGNORED BOTH THE UNDISPUTED
       MATERIAL FACTS AND UNAMBIGUOUS CONTRACT TERMS. ........8

III.   WHILE NOT MATERIAL TO WHETHER GLS BREACHED,  THE
       EXTRINSIC EVIDENCE WEIGHED AGAINST GLS. ............................20

STATEMENT OF STANDARD OF REVIEW .....................................................22

SUMMARY OF ARGUMENT ............................................................................24

ARGUMENT .....................................................................................................26

I.     THE DISTRICT COURT IGNORED THE CONTRACT'S PLAIN
       LANGUAGE AND INSTEAD RELIED ON EXTRINSIC
       EVIDENCE. ...........................................................................................26

II.    THE DISTRICT COURT'S INTERPRETATION OF THE
       GUARANTEED WORKSHARE PROVISION WAS INCORRECT. ........30

III.   IN EFFECT, THE DISTRICT COURT AMENDED THE SAL
       SUBCONTRACT TO DELETE THE AWARD FEE PROVISION...........41

IV.    THE DISTRICT COURT'S INTERPRETATION OF THE PROMPT
       PAYMENT PROVISIONS IS INCORRECT AS A MATTER OF
       LAW. ......................................................................................................44

V.     GLS BREACHED ITS DUTY OF GOOD FAITH AND FAIR
       DEALING BY REFUSING TO SPONSOR SAL'S DCAA CLAIM. ........46

CONCLUSION .................................................................................................53

iii

REQUEST FOR ORAL ARGUMENT ..................................................................53

iv

# TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................22-23

*Banca Del Sempione v. Provident Bank*,
75 F.3d 951 ......................................................................................43

*Barron v. NetVersant-N. Va., Inc.*,
68 Va. Cir. 247 (Va. Cir. Ct. 2005).................................................36

*Countryside Orthopaedics, P.C. v. Peyton*,
261 Va. 142 (2001) .........................................................................32

*Elite Entm't, Inc. v. Khela Bros. Entm't, Inc.*,
396 F. Supp. 2d 680 (E.D. Va. 2005) .............................................31

*Enomoto v. Space Adventures, Ltd.*,
624 F. Supp. 2d 443 (E.D. Va. 2009) .............................................47

*Gordonsville Energy v. Virginia Elec. & Power Co.*,
257 Va. 344, 512 S.E. 2d 811 (Va. 1999)......................................42

*Gresham v. Lumbermen's Mut. Cas. Co.*,
404 F.3d 253 (4th Cir. 2005) ..........................................................23

*Horton v. Horton*,
254 Va. 111 (1997) ...........................................................32, 36-37, 41

*McLean House v. Maichak*,
231 Va. 347, 344 S.E. 2d 889 (Va. 1986).......................................42

*Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*,
403 F.3d 188 (4th Cir. 2005) ..........................................................23

*Podberesky v. Kirwan*,
38 F.3d 147 (4th Cir. 1994) ............................................................23

*Powell Mountain Joint Venture v. Moore*,
248 Va. 63 (Va. 1994).........................................................38, 42, 48-49

*Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*,
284 Va. 382 (Va. 2012)...................................................................45

*Stanley's Cafeteria, Inc. v. Abramson*,
226 Va. 68 (Va. 1983).....................................................................38

*Stevens v. Howard D. Johnson Co.*,
    181 F.2d 390 (4th Cir. 1950) ...................................................................24

*Tandberg, Inc. v. Advanced Media Design, Inc.*,
    No. 09cv863, 2009 U.S. Dist. LEXIS 109185 (E.D. Va. Nov. 23, 2009) .............32

*Travel Ctr. v. Barram*,
    236 F.3d 1316 (Fed. Cir. 2001) ...............................................................33

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
    156 F.3d 535 (4th Cir. 1998) ........................................................ 47-48, 50

*Wells v. Liddy*,
    186 F.3d 505 (4th Cir. 1999) ...................................................................22

## STATUTES

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1332 .......................................................................................1

## OTHER AUTHORITIES

10A Charles A. Wright et al., Federal Practice and Procedure § 2720 (2d ed.
    1983) ....................................................................................................22

E.D. Va. Rule 56(B) ..................................................................................4

Fed. R. App. P. 32(a)(5) ...........................................................................55

Fed. R. App. P. 32(a)(6) ...........................................................................55

Fed. R. App. P. 32(a)(7)(B)(iii) .................................................................55

Fed. R. App. P. 32(a)(7)(C) .......................................................................55

Fed. R. Civ. P. 56(c) ..................................................................... 22-23, 27

Fed. R. Evid. 1006 ................................................................................2, 47

4831-1672-1184.2

Plaintiffs-Appellants, Shee Atiká Languages, LLC ("SAL") and The Shee Atiká Languages, LLC, Liquidating Trust (the "Trust") (collectively, "The Shee Atiká Plaintiffs"), by counsel, respectfully state as follows in support of their appeal from the Memorandum Opinion whereby the District Court entered Final Judgment in favor of Defendant-Appellee, Global Linguist Solutions, LLC ("GLS").

## STATEMENT OF JURISDICTION

Appellants, The Shee Atiká Plaintiffs, appeal from a judgment of the U.S. District Court for the Eastern District of Virginia, Alexandria Division (the "District Court"). The District Court's Final Judgment, entered August 4, 2014, granted summary judgment in favor of Defendant-Appellee, GLS.

The District Court had diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. The District Court also had general and specific jurisdiction over Defendant-Appellee, GLS, because GLS resides in the Eastern District of Virginia and because GLS engaged in activity in the Eastern District of Virginia that gave rise to The Shee Atiká Plaintiffs' claims.

On September 2, 2014, The Shee Atiká Plaintiffs timely filed their Notice of Appeal. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1.      Did the District Court err by ignoring the undisputed material facts[1]—including the FRE 1006 SAL Subcontract Summary[2] that GLS admitted was an accurate summary of the contract provisions at issue?

2.      Because the SAL Subcontract was an integrated written contract whose provisions were unambiguous, did the District Court err by considering extrinsic evidence to interpret and indeed vary its terms?

3.      To the extent that it was proper for the Court to consider extrinsic evidence, did the District Court err by ignoring contemporaneous documents showing that GLS shared SAL's interpretation of the Subcontract, that GLS acknowledged that it had breached its obligations to SAL, and that GLS sought to avoid its contractual obligations by contriving various pretextual arguments that the District Court ultimately accepted?

---

[1] The Shee Atiká Plaintiffs' Statement of Undisputed Material Facts upon which their motion for partial summary judgment was based is cited herein as the "SUMF."

[2] The "SAL Subcontract" is the December 21, 2007 Subcontract Agreement No. INSCOM-SHEE ATIKA-0001 between GLS and SAL as subsequently modified by the parties.  Its terms and conditions are set forth in the Federal Rule of Evidence 1006 Summary of Subcontract Agreement Provisions attached to the Complaint as Exhibit A (Dkt. 1-4) (the "FRE 1006 SAL Subcontract Summary"). During the discovery process, GLS admitted that the FRE 1006 SAL Subcontract Summary accurately reflects the SAL Subcontract as modified by the Modifications up through Modification No. 21.  (JA 668-69).

4831-1672-1184.2

4.     Did the District Court err by ignoring the plain language of the SAL Subcontract and instead basing its decision on allegations of "fact" that The Shee Atiká Plaintiffs disputed, that were contrary to the record, and that were not "material" as a matter of law?

## STATEMENT OF THE CASE

## I.     THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT DID NOT COMPORT WITH FEDERAL RULE 56 STANDARDS.

Federal Rule 56 could not be more clear that summary judgment is proper only when the undisputed material facts entitle the moving party to judgment as a matter of law.  This case could and should have been decided based on the plain language of the contract between the parties, the SAL Subcontract.  That is exactly what The Shee Atiká Plaintiffs asked the District Court to do when they moved for summary judgment on Count I (breach of contract) on December 4, 2013.  (Dkt. # 29) (R.675-77).[3]  In support of their motion for partial summary judgment, The Shee Atiká Plaintiffs identified the undisputed material facts on which their breach of contract claim was based.  The SAL Subcontract upon which these

---

[3] The Amended Memorandum in Support of The Shee Atiká Plaintiffs' Motion for Partial Summary Judgment—filed on December 22, 2013 (JA 632-66)—reflected the fact that, on December 18, 2013, GLS had produced supplemental discovery responses showing that the revenue received by GLS under the Prime Contract was higher than previously reported, thus necessitating certain adjustments to The Shee Atiká Plaintiffs' previous filings.  (Dkt. # 54) (R.1247-50).

4831-1672-1184.2

breach of contract claims were based had been drafted by Defendant-Appellant, GLS. (JA 994). The SAL Subcontract was an integrated, written contract. (JA 639; SUMF ¶ 2).[4] The provisions of the SAL Subcontract at issue in this case were—as GLS conceded in its submissions to the District Court—"unambiguous." (JA 639, 912; SUMF ¶ 3). Even if the SAL Subcontract had been ambiguous, the fact that it had been drafted by GLS obviously meant that any ambiguity should have been resolved against GLS as a matter of law.

In opposition to The Shee Atiká Plaintiffs' motion for partial summary judgment, GLS certainly did not comply with the requirements for identifying genuine issues of material fact set forth in E.D. Va. Rule 56(B). In fact, GLS did not expressly dispute either the accuracy or the materiality of a single one of the 53 numbered paragraphs comprising The Shee Atiká Plaintiffs' SUMF. Instead, in what seemed at the time like an act of false bravado, GLS filed its own cross-motion for summary judgment. (JA 865-71). With respect to each of the three contract provisions at issue, GLS asked the District Court to use parol evidence—including deposition testimony and course of dealing—to vary the plain language

---

[4] *See* JA 78 ("This Subcontract, together with all documents, specifications, and drawings incorporated herein by reference, constitutes the entire agreement between GLS and Subcontractor, and there are no terms, conditions, or provisions, either oral or written, between the parties other than those herein contained, and this Subcontract supersedes any and all oral or written representations, inducements, or understandings of any kind or nature between the parties relating to the Services.") (Article XXVIII).

4

of express contract terms. The alleged "facts" upon which GLS based this request were very much in dispute, as The Shee Atiká Plaintiffs' Opposition[5] documented with copious citations to the record. The Shee Atiká Plaintiffs' Opposition also explained why these alleged facts were simply not "material," *i.e.* outcome-determinative, in view of the unambiguous contractual provisions upon which The Shee Atiká Plaintiffs sought to have the District Court resolve their breach of contract claims as a matter of law.

Both in support of their own motion for summary judgment and in opposition to GLS's cross-motion, The Shee Atiká Plaintiffs reminded the District Court of three basic propositions that should have been obvious. First, because the contract at issue was—according to both parties—"unambiguous," consideration of parol evidence to vary its terms was improper. Second, if any provision was in fact ambiguous, any such ambiguity should have been resolved against its drafter, GLS. Third, if the disputed issues of fact raised by GLS were in any way material, such factual disputes were not properly resolved by the Court on summary judgment.

While objecting to any consideration by the District Court of extrinsic evidence to resolve The Shee Atiká Plaintiffs' breach of contract claim, their

---

[5] *See* The Shee Atiká Plaintiffs' Reply Memorandum in Support of their Motion for Partial Summary Judgment on Count I of the Complaint (Breach of Contract) and Opposition to Defendant's Cross Motion for Summary Judgment (JA 908-1239) ("The Shee Atiká Plaintiffs' Opposition").

5

Opposition cited additional evidence that had recently come to light.  The extrinsic evidence cited in The Shee Atiká Plaintiffs' Opposition—although not material to the proper interpretation of the contractual provisions at issue—was sufficient to create triable issues of fact with respect to whether GLS breached its covenant of good faith and fair dealing.  This claim provided an alternative basis for finding breach of the SAL Subcontract.  It was not necessary for the District Court to reach this claim, however, if it confined its analysis to the express contract provisions at issue and interpreted them correctly.[6]  This extrinsic evidence—cited by paragraph number in The Shee Atiká Plaintiffs' Opposition as "AUMF"—also highlighted the pretextual nature of GLS's arguments with respect to breach of contract.

Oral argument—which originally had been noticed for January 3, 2014—was rescheduled several times.[7]  By Order dated December 11, 2013, the District Court referred the parties to mediation before a magistrate judge.  After the mediation did not result in a negotiated settlement, the District Court heard oral

---

[6] It was also relevant to unjust enrichment (Count II), an issue beyond the scope of this appeal.

[7] When The Shee Atiká Plaintiffs filed their original motion for partial summary judgment on December 4, 2013, they noticed it for oral argument on January 3, 2014.  (Dkt. # 30) (R.678-80).  The following day, December 5, 2013, the District Court set the hearing for January 13, 2014.  Then, on December 11, 2013, the District Court reset the hearing back to January 3, 2014.  By Order dated December 30, 2013, the District Court rescheduled oral argument for January 17, 2014.  (Dkt. #65)  (R. 2047).

6

argument on the parties' cross-motions for summary judgment on January 17, 2014.

Trial of this case was scheduled to begin on Monday, February 25, 2014. On Friday, February 14, 2014, however, the District Court entered an Order (the "February 14 Order") that was subsequently filed on Tuesday, February 18, 2014. (Dkt. # 79) (R.3181). The February 14 Order stated as follows:

> The Court has determined that summary judgment in favor of defendant is appropriate; however, the memorandum opinion is not finished. To avoid unnecessary trial preparation by counsel, it is hereby
>
> ORDERED that the jury trial presently set in this matter for 10:00 a.m., Tuesday, February 25, 2014, be and is CANCELED and the memorandum opinion will issue forthwith. The time for noticing an appeal of the Court's decision will not begin to run until the memorandum opinion has issued and judgment has been entered.

Thereafter, articulating a rationale for the result that had been announced in the February 14 Order took longer than the median time for disposition of civil cases in the Eastern District of Virginia.[8] On August 1, 2014, the District Court

---

[8] In 2013, the median time for disposition of civil cases filed in the Eastern District of Virginia was five months. *See* Table C-5, U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2013, available at http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJudicialCaseloadStatistics/2013/tables/C05Mar13.pdf .

issued the Memorandum Opinion (JA 1848-77) which resulted in the entry of the August 4, 2014 Final Judgment (JA 1879) from which The Shee Atiká Plaintiffs appeal.

When it was first presented to the District Court by way of The Shee Atiká Plaintiffs' motion for partial summary judgment, this was a simple breach of contract case. At that time, there were no disputed issues of material fact that required a jury trial to resolve. By the time the District Court issued its Memorandum Opinion, however, the SAL Subcontract at issue in this case was barely recognizable. Rather than rely upon the express language of the SAL Subcontract, the District Court effectively rewrote it for the benefit of GLS. To reach this result, the District Court allowed GLS to rely upon deposition testimony and evidence of course of dealing. The District Court also based its decision based on certain "facts" alleged by GLS in support of its cross-motion. These purported facts were—as set forth in The Shee Atiká Plaintiffs' Opposition—contradicted by the record, disputed by The Shee Atiká Plaintiffs, and not material.

## II.    THE DISTRICT COURT IGNORED BOTH THE UNDISPUTED MATERIAL FACTS AND UNAMBIGUOUS CONTRACT TERMS.

The provisions of the SAL Subcontract at issue, as drafted by GLS and signed by both parties, are unambiguous. These provisions are the "Guaranteed Workshare Provision," the "Award Fee Provision," and the "Prompt Payment

8

Provisions."[9]  (JA 68, 71-72, 144, 640; SUMF ¶ 4).  The undisputed material facts established, as a matter of law, that GLS materially breached each of these provisions.  In finding otherwise, the District Court misinterpreted each provision.

### A.  The Guaranteed Workshare Provision Entitled SAL to Work Equal to 15% of GLS's Total Prime Contract Revenues.

The Guaranteed Workshare Provision entitled SAL to "15% of the services to be provided under the Prime Contract."[10]  (JA 60, 68; SUMF ¶¶ 5-6).  It is clear from the plain language of the SAL Subcontract that this provision was intended to refer to all services under the Prime Contract.  In fact, on February 18, 2008, the parties expressed this intent by modifying the SAL Subcontract to eliminate any reference to "linguist work" while keeping the reference to "services" generally. (JA 366) (Modification 2 to SAL Subcontract).  Elsewhere, one of these modifications described the workshare obligation by reference to "services" generally—not just linguist services.  (JA 368-84) (Modification 3 to SAL Subcontract).  Further evidence of the parties' intent that appears on the face of the SAL Subcontract itself is the fact that the ceiling value of the SAL Subcontract

---

[9] The "Prompt Payment Provisions" are the "Prompt Payment Provision" (JA 72, 644; SUMF ¶ 26) and the "Prompt Invoice Review Provision."  (JA 72, 644; SUMF ¶ 26).

[10] The "Prime Contract" is U.S. Government Prime Contract No. W911W4-08-D-0002 awarded by the U.S. Army Intelligence and Security Command ("INSCOM") in Fort Belvoir, Virginia.

9

($696,750,000.00)[11] was equal to exactly 15% of the ceiling value of all revenues payable to GLS under the Prime Contract ($4,645,000,000.00). (JA 40-42; SUMF ¶ 5).

GLS's compliance with the Guaranteed Workshare Provision was to be determined "on the last day of contract performance." (JA 68; AUMF ¶ 2). As originally drafted, the SAL Subcontract did not specify a concrete end date; however, on December 7, 2009, GLS and SAL modified the SAL Subcontract to explicitly identify December 5, 2012 as the end date for "the term of this subcontract." (JA 396-97). On eight subsequent occasions, the parties executed written modifications to the SAL Subcontract. (JA 674). At no time after December 7, 2009, however, did the parties ever again execute a written modification to extend the term of the SAL Subcontract. (JA 58). Moreover, Article XIII of the SAL Subcontract offered GLS an opportunity to extend the term of the contract by providing SAL with "notice of intent to exercise" and "notice to exercise" this option. (JA 12). GLS never did so, however. (JA 2).

---

[11] As amended by Modification No. 3 to the SAL Subcontract, Article IX states: "The total value of all orders placed under this Subcontract shall not exceed $696,750,000.00." (JA 68; AUMF ¶ 5).

1.    **GLS unilaterally reinterpreted the Guaranteed
Workshare Provision midway through its term.**

To track the percentage of overall Prime Contract work allocated to SAL, the parties modified the SAL Subcontract in June 2008 to require GLS to provide a monthly update containing three categories of information:  (1) SAL's Workshare under the SAL Subcontract; (2) the Workshare of GLS's other subcontractors on the Prime Contract; and (3) GLS's total revenue under the Prime Contract at that time.  (JA 368-84; SUMF ¶ 8).  These updates were to be provided in a "Monthly Status Report" or "subcontractor allocation matrix" referenced in Article VIII of the SAL Subcontract.  (JA 369-70; AUMF ¶ 8).  Notwithstanding the foregoing requirement, GLS did not regularly provide SAL with the Monthly Status Report. (JA 687; SUMF ¶ 9).

After multiple requests from SAL to obtain information about the total revenue that GLS had received from the Prime Contract, in October 2009, GLS finally began providing that information to SAL in Monthly Status Reports.  (JA 179-96, 687; SUMF ¶ 10).  Every Monthly Status Report sent by GLS to SAL—to the extent that it contained the total revenue that GLS had received under the Prime Contract at that point—showed that the work assigned to SAL was less than 15%. (JA 179-96; SUMF ¶ 11).   In fact, work awarded to SAL under the SAL Subcontract never exceeded 10% of GLS's total revenue under the Prime Contract. (JA 179-96).   Each Monthly Status Report calculated SAL's Workshare as a

11

percentage of GLS's total revenue under the Prime Contract from all "services"—not just linguists.  (JA 691; SUMF ¶ 13).

On July 1, 2011, GLS was awarded the Successor Prime Contract.[12]  (JA 688).  Before July 1, 2011, all Monthly Status Reports from GLS had calculated compliance with the Guaranteed Workshare Provision by showing SAL's revenue as a percentage of GLS's total revenue under the Prime Contract.  (JA 691; SUMF ¶¶ 13, 14).  After being awarded the Successor Prime Contract, however, GLS began calculating compliance with the Guaranteed Workshare Provision in a manner different than that reflected in any prior Monthly Status Report.  (JA 91; SUMF ¶ 14).

On August 12, 2011, GLS sent SAL a letter that unilaterally announced a "mid course adjustment" to the way SAL's Workshare would be calculated under the SAL Subcontract ("GLS's Workshare Repudiation Letter").  (JA 200-02, 689; SUMF ¶ 15).  Notwithstanding the fact that GLS had previously calculated SAL's Workshare based on total revenue for more than two and a half years, GLS's Workshare Repudiation Letter claimed that "the current approach to workshare

---

[12]   The term "Successor Prime Contract" refers to Defense Language Interpretation Translation Enterprise ("DLITE") contract no. W911W4-11-D-0004 awarded to GLS by the U.S. Army on July 1, 2011.  The Successor Prime Contract called for the provision of essentially the same services as those that were the subject of the original Prime Contract except that it was worldwide in geographic scope and extended beyond the scheduled December 5, 2012 expiration date of the Prime Contract.  (JA 708-09).

12

measurement" was "inconsistent with [the] contract language." (JA 200, 688; SUMF ¶ 16). GLS went on to state that, from that point forward, it would calculate SAL's Workshare based on GLS's revenue only insofar as it related to the percentage of linguist revenue under the Prime Contract. (JA 200-01; SUMF ¶¶ 20-21).

GLS's Workshare Repudiation Letter was accompanied by a Monthly Status Report dated July 18, 2011 (the "Adjusted Status Report"). (JA 204-05; SUMF ¶ 17). The Adjusted Status Report calculated GLS's compliance with the Guaranteed Workshare Provision using the new methodology. (*Id.*; JA 689). Under this new approach, the Adjusted Status Report calculated GLS's revenue to be $1,690,371,201.35—as opposed to the $1,961,380,954.00 that GLS had reported on March 16, 2011. (JA 196, 204; SUMF ¶ 17). The result of this recalculation was to inflate SAL's workshare from 9.83% according to the original Guaranteed Workshare Provision to 13.59% according to the "mid course adjustment" calculation. (*Id.*). After August 12, 2011—the date of GLS's Workshare Repudiation Letter—GLS did not send a single Monthly Status Report to SAL. (JA 686; SUMF ¶ 21). And notwithstanding its announcement that SAL's Workshare should be calculated based only on revenue from linguists, GLS continued—at least internally—to track SAL's Workshare as a percentage of GLS's total Prime Contract revenue. (JA 1076-93; AUMF ¶¶ 16-19).

13

Thereafter, SAL repeatedly contested GLS's new interpretation of the Guaranteed Workshare Provision, including by way of letters from SAL President Robert Arsenault dated August 16, 2011 and January 16, 2012. (JA 347-54, 698-99; SUMF ¶ 19).[13]  However, at no time did GLS recant the interpretation of the Guaranteed Workshare Provision contained in its Workshare Repudiation Letter. (JA 686-699; SUMF ¶ 20).  Moreover, at no time after the Workshare Repudiation Letter did GLS ever offer SAL sufficient work to achieve a workshare equal to at least 15% of GLS's total revenue under the Prime Contract.  (JA 686; SUMF ¶ 21).

### 2.    SAL performed all of its obligations to GLS and dissolved only after the agreed-upon term of the SAL Subcontract.

On January 16, 2012, SAL sent GLS written notice pursuant to the Disputes Clause of the SAL Subcontract, Article XXII.  (JA 351-54; SUMF ¶ 19).  As had been the case with prior such communications, SAL's January 16, 2012 correspondence did not lead to any resolution of the parties' disputes stemming from the Workshare Repudiation Letter.  (JA 686, 689; SUMF ¶ 20).  Thereafter, SAL notified GLS that it would dissolve and wind up its affairs but "fully intended to honor its existing commitments" under the SAL Subcontract.  (JA 1057-59; AUMF ¶ 14).  On more than one occasion, SAL provided written assurances to

---

[13] GLS never responded to such communications, at least not to SAL. Internally, however, GLS debated whether SAL "really want[ed] to go to court." (JA 1212).

14

GLS that it was willing and able to continue performance of the SAL Subcontract. (JA 1060-63; AUMF ¶ 14). At least internally, GLS acknowledged in January and February of 2012 that SAL was "continuing to perform work on [its] current subcontract to its completion" and that SAL's communications on the issue "clears it up nicely." (*Id.*; JA 1064-66). In fact, it was not until February 6, 2013—two months after the term of the SAL Subcontract ended—that SAL officially dissolved. (JA 359).

Starting in May 2012, the remaining work available to GLS continued to decline, as GLS had previously anticipated when it sent the Workshare Repudiation Letter. (JA 1094-95; AUMF ¶¶ 17-19). Thereafter GLS offered SAL only minimal work that consisted completely or substantially of CAT II and CAT III linguists. (*See e.g.,* JA 2095-2101). The SAL Subcontract, however, explicitly states that "[i]n no event shall Subcontractor be required to employ CAT II or CAT III personnel." (JA 68; SUMF ¶ 8). Consistent with its rights under the SAL Subcontract, SAL refused to accept this additional work from GLS. (JA 656). From that point forward, GLS's work under the Prime Contract continued to dwindle. In fact, between June 2012 and the last day of the SAL Subcontract— December 5, 2012—GLS received a total of $31,369,408 under the Prime Contract. (JA 1095; AUMF ¶ 17). This is equal to only 1.35% of GLS's total Prime Contract revenue, even though this time period represented 10% of GLS's

overall performance period under the Prime Contract. (JA 1095). As of July 27, 2012, GLS projected internally that SAL's workshare—as calculated using GLS's total revenue—would not exceed 13% by December 2012. (JA 1090; AUMF ¶ 16).

**B.    The Award Fee Provision Entitled SAL to Receive At Least 15% of Award Fees Paid to GLS Under the Prime Contract.**

The Award Fee Provision entitled SAL to a pro rata share of any award fees that GLS received in connection with the performance of the Prime Contract. (JA 144; SUMF ¶ 22). Specifically, the Award Fee Provision of the SAL Subcontract, as set forth in the Statement of Work, states as follows:

> 5.0 Performance Requirements/Award Fee Criteria
>
> The Subcontractor will normally receive the same Award Fee as the Prime Contractor unless the Subcontractor presents strong and completing [sic] justification as to why they [sic] should receive a higher award fee then [sic] the rest of the GLS team.

(JA 144, 699; SUMF ¶ 22). SAL and GLS modified the Statement of Work on six separate occasions. (JA 366-402). Yet none of these modifications deleted or otherwise changed the Award Fee Provision. (*Id.*)

During the course of the Prime Contract, GLS received $118,052,087.24 in award fees from the U.S. Army. (JA 643; SUMF ¶ 23). GLS stated in 2009 that "SAL had been a major contributor" in it receiving "the highest average award fees in the history of nearly 9 years of this and the previous contract" and satisfying the

16

customer.  (JA 165-74, 700-01; SUMF ¶ 25).  Despite the plain language of the

contract and SAL's exemplary performance, GLS has not paid SAL any portion of

the award fees that GLS received from the U.S. Army.  (JA 404; SUMF ¶ 24).

### C. GLS's Withholding Payment of SAL Invoices Totaling $3,717,522 Breached the Prompt Payment Provisions.

The Prompt Payment Provision of the SAL Subcontract states that "GLS

will remit payment to Subcontractor within ten (10) business days of receipt of

payment to GLS for Subcontractor's services by the Client [the U.S. Army] but

such payment shall not exceed 60 days from receipt of an acceptable Subcontractor

invoice."  (JA 72; SUMF ¶ 27).  Similarly, the Prompt Invoice Review Provision

of the SAL Subcontract required GLS "to review Subcontractor's invoices

promptly upon submission" and to make payment within five calendar days

"[u]nless GLS notifies Subcontractor of a discrepancy."  (*Id.*).  In this regard, the

Prompt Invoice Review Provision states:

> The invoice shall be deemed acceptable and GLS
> shall pay Subcontractor within the time period set forth
> [in the Prompt Payment Provision] ***regardless of whether
> GLS subsequently discovers a discrepancy with such
> invoice.*** GLS and Subcontractor each agree to work
> cooperatively with the other to correct any discrepancy.

(*Id*.)

On May 18, 2010, the Defense Contract Audit Agency ("DCAA") issued a

Form 1 to GLS.  The DCAA Form 1 questioned certain SAL invoices that GLS

17

had previously paid to SAL totaling $5,373,289. (JA 704; SUMF ¶ 28). Pursuant to the Form 1, the U.S. Army withheld payment from GLS totaling $5,373,289. (JA 704, 706; SUMF ¶ 29). In response, SAL withdrew certain previously invoiced costs and issued GLS a credit of roughly $1.3 million. (JA 704-05; SUMF ¶ 34).[14] Soon thereafter—on June 30, 2010—GLS and SAL met with DCAA to discuss the validity of the remaining amount at issue in the Form 1. (JA 706-07). Despite working with SAL to present its case, GLS subsequently withheld the remaining funds questioned in the Form 1 from two separate SAL invoices. (JA 705, 708; SUMF ¶ 36). GLS did not withhold the majority of these funds from SAL's invoices until January 12, 2012. (JA JA 708; SUMF ¶ 36).[15] By way of correspondence dated January 16, 2012, SAL quickly disputed this unilateral action on the part of GLS. (JA 51-54, 708; SUMF ¶ 37).

On March 28, 2012, SAL sent GLS a Certified Claim for submission to DCAA. (JA 207-20; SUMF ¶ 33). SAL's Certified Claim contained substantiation for $3,717,522.00 of the $5,373,289.00 in costs that DCAA had challenged and demanded that GLS immediately reimburse SAL for the full

---

[14] SAL and GLS differ slightly in terms of the exact amount that SAL withheld. SAL's record's show $1,359,696, while GLS contends that SAL withheld $1,250,008.40. (JA 704-05).

[15] Again, SAL and GLS differ as to the exact amount that was withheld by GLS on January 12, 2012. SAL's records show that $2,430,964 was withheld, while GLS contends that $2,259,850.44 was withheld.

amount that GLS had withheld from SAL's invoices. (*Id.*). In response, GLS stated internally that it was not "the right time to file a claim with INSCOM." (JA 1204). In the end, however, GLS never submitted SAL's Certified Claim to DCAA. (JA 645; SUMF ¶ 35).

SAL lacked—and continues to lack—standing to directly file a claim with the government to demand payment of costs that DCAA has questioned and that the U.S. Army has not paid. (JA 706; SUMF ¶ 30). Pursuant to the Prime Contract, only GLS can seek payment from the U.S. Army of any charges that had been questioned by DCAA. (*Id.*). SAL, therefore, is left with no recourse to recover the funds to which it is owed.

### D. GLS's Breach of the SAL Subcontract Resulted in Damages to SAL in the Aggregate Amount of At Least $25,224,906.

SAL's damages resulting from GLS's breach of the Guaranteed Workshare Provision are $3,799,571. This represents the difference between the fee that SAL would have carried if it had been given work equal to 15% of total GLS revenue under the Prime Contract and the fee on the smaller volume of work that it actually received from GLS, plus SAL's unrecovered fixed costs. (JA 646-48, 738-864; SUMF ¶¶ 38-50). The calculation of SAL's damages for breach of the Award Fee Provision is also simple, representing 15% of GLS's total award fees under the Prime Contract, for a total of $17,707,813.09. (JA 144; SUMF ¶ 53). Finally, SAL's damages resulting from GLS's breach of the Prompt Payment Provision are

19

substantiated in SAL's Certified Claim and amount to $3,717,522. (JA 207-20; SUMF ¶ 52).

## III.  WHILE NOT MATERIAL TO WHETHER GLS BREACHED, THE EXTRINSIC EVIDENCE WEIGHED AGAINST GLS.

After filing their motion for partial summary judgment, The Shee Atiká Plaintiffs had the benefit of GLS's document production and Rule 30(b)(6) deposition testimony. This additional evidence—which was catalogued in detail in the AUMF portion of The Shee Atiká Plaintiffs' Opposition to GLS's cross-motion—was not dispositive but certainly suggested that GLS's contractual arguments were contrived and pretextual. For example, GLS's internal documents established the following:

> The workshare commitments that GLS made to L-3 and other subcontractors made it impossible for GLS to both honor those obligations and comply with the Guaranteed Workshare Provision of the SAL Subcontract. Since at least June 2010, GLS foresaw that it likely never would be able to meet its 15% Guaranteed Workshare obligation to SAL, was concerned about a lawsuit, and concluded that "it is likely that the SAL lawsuit will be successful to the tune of about $8.5m" on the Guaranteed Workshare issue alone.

(JA 968-73; AUMF ¶ 2) (footnotes and citations omitted). Other internal GLS documents established the pretextual nature of the reinterpretation of the Guaranteed Workshare Provision that GLS used to try to excuse its breach after the fact. For example:

20

> By the time that GLS awarded the Successor Prime Contract, it had become virtually certain that GLS could not meet its 15% Guaranteed Workshare obligation to SAL. GLS thus used various subterfuges to try to reduce and/or offset its anticipated liability to SAL for breach of contract—including the "midcourse adjustment."[16]

(JA 1014-18; AUMF ¶ 10). The subsequent dissolution of SAL—which the District Court concluded was somehow a material breach—in fact did not justify GLS's breach of the Guaranteed Workshare Provision. (JA 1058-72; AUMF ¶ 14). Unfortunately, the District Court ultimately allowed GLS to succeed in its admittedly pretextual effort to use SAL's dissolution to justify GLS's breach of the Guaranteed Workshare Provision. (JA 1065-66, 1074-75; AUMF ¶ 15). The District Court ultimately bought into GLS's arguments with respect to the Prompt Payment Provision—even though the evidence was uncontroverted that GLS was seeking to use the DCAA Form 1 simply to offset GLS's breach of the Guaranteed Workshare Provision. (*Id.*).

Although this and other extrinsic evidence cited in the AUMF was sufficient to warrant a jury trial of their unjust enrichment claim, The Shee Atiká Plaintiffs

---

[16] As of July 8, 2011, GLS estimated in its internal Weekly Status Report that its risk for breach of the Guaranteed Workshare Provision "is approximately $5.56M." (JA 1016). GLS's July 8, 2011 Weekly Status Report stated that GLS Director of Contracts would be meeting with SAL on July 14, 2011 "to inform Shee Atika that future Work Share will be calculated based on **linguist hours only** (as opposed to total contract value)" and concluded that "[r]e-defining work share calculation could result in Shee Atika being at or near their [sic] work share requirement." (JA 1017) (emphasis in original).

21

have not appealed the dismissal of Count II of their Complaint. Rather, the sole focus of this appeal is on the District Court's dismissal of The Shee Atiká Plaintiffs' breach of contract claim—which can and should be reversed as a matter of law.

## STATEMENT OF STANDARD OF REVIEW

This Court reviews grants of summary judgment *de novo*. This Court's review is subject to the same standard that, pursuant to Federal Rule of Civil Procedure 56, the District Court should have applied. *See, e.g.*, *Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999). Pursuant to Rule 56, summary judgment is appropriate only where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." 10A Charles A. Wright et al., Federal Practice and Procedure § 2720 (2d ed. 1983). In the words of the Supreme Court, Rule 56 permits the grant of summary judgment should be granted only when the case is "so one-sided that a party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). If the evidence in this case permitted either of two conclusions, then a jury—not the District Court— should have resolved the dispute. *Id.* at 250-51. Under *Liberty Lobby*, it was not

22

the proper role of the District Court in this case to "weigh the evidence and determine the truth of the matter." *Id*. at 250. Instead, the District Court was limited by Rule 56 to determining whether there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

Consistent with *Liberty Lobby*, this Court will reverse a grant of summary judgment when the district court overextends its authority by attempting to "resolve [] factual dispute[s]" and "resolve conflicts in the evidence" as part of its summary judgment analysis. *Podberesky v. Kirwan*, 38 F.3d 147, 156-57 (4th Cir. 1994) (reversing grant of summary judgment when the district court ignored several disputes of evidence and improperly attempted to resolve others that were "not inconsequential and could have been resolved only at trial"). *See also Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 202 n.18 (4th Cir. 2005) (vacating lower court's grant of summary judgment in part because "the district court inappropriately made a finding of fact" when it found that the insured failed to notify insurer of its claim without good cause); *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 259-262 (4th Cir. 2005) (reversing grant of summary judgment based on district court finding that the employee was terminated for cause because the facts it used to distinguished this case from pertinent precedent were "irrelevant"). In short, a motion for summary judgment should be granted

23

"only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).

## SUMMARY OF ARGUMENT

The District Court erred by finding that GLS did not breach the Guaranteed Workshare, Prompt Payment, and Award Fee Provisions. The undisputed material facts established breach of each of these provisions. Accordingly, the ruling of the District Court should be reversed, and The Shee Atiká Plaintiffs-Appellants' Motion for Partial Summary Judgment should be granted.

In support of the result that the District Court had announced several months earlier, the Memorandum Opinion relied on "findings of fact" that were improper under Federal Rule 56 and otherwise contrary to law. The purported facts were contradicted by the evidentiary record and disputed by The Shee Atiká Plaintiffs. The Shee Atiká Plaintiffs' Opposition cited the portions of the record with which these alleged "facts" could not be reconciled, explained why deposition testimony and evidence of course of dealing could not be used to vary express contract terms, and otherwise disputed both their accuracy and their materiality.

If these and other disputes were material, they should have been submitted to the jury. In reality, however, these disputes were not material to The Shee Atiká Plaintiffs' breach of contract claims. For example, the undisputed fact that

24

performance of the Prime Contract continued through July 3, 2013 (JA 1850) did **not** extend the term of the SAL Subcontract beyond December 2012. The SAL Subcontract had previously been modified by written agreement so that it ended in December 2012. Its performance was thus complete before the February 2013 dissolution of SAL that the District Court found somehow justified GLS's admitted breach of the Guaranteed Workshare Provision.

Even if the term of the SAL Subcontract had been extended, any such extension was not material. The District Court ultimately went a step further and relied upon findings of immaterial facts to support its conclusions. For example, by deciding that SAL ceased accepting additional work under the SAL Subcontract because it was winding down (JA 1852-53), the District Court made an improper factual determination that was controverted by undisputed facts, ignored GLS's prior material breach, and was not material. Why SAL did or did not do something is not dispositive of whether SAL breached a contractual obligation—especially since the plain language of the SAL Subcontract expressly permitted SAL to refuse the work in question. Similarly flawed are the District Court's additional factual findings made to bootstrap its conclusion that GLS had not materially breached the SAL Subcontract long before SAL declined new work.

# ARGUMENT

## I.   THE DISTRICT COURT IGNORED THE CONTRACT'S PLAIN LANGUAGE AND INSTEAD RELIED ON EXTRINSIC EVIDENCE.

### A.   The Undisputed Material Facts Established That GLS Breached Each of the SAL Subcontract Provisions at Issue.

#### 1.   GLS never expressly disputed the facts material to The Shee Atiká Plaintiffs' breach of contract claims.

To decide The Shee Atiká Plaintiffs' claims for breach of the SAL Subcontract, the District Court did not need to resolve and should not have resolved any disputed issues of material fact. The terms and conditions of this integrated written contract are indisputable and undisputed. Calculating the damages due for breach was, by and large, simple math.[17] In the proceedings before the District Court, GLS conceded that the provisions under which The Shee Atiká Plaintiffs sought recovery—the Guaranteed Workshare, Award Fee, and Prompt Payment Provisions—are unambiguous. (Dkt. #15) (R. 419). Even though GLS later sought to use extrinsic evidence to vary the express terms of the SAL Subcontract, GLS never contended that the contract was ambiguous.

On a motion for summary judgment, the proper role of the District Court was to interpret the contract as a matter of law. Rule 56 did not permit the District

---

[17] With respect to one category of damages caused by GLS's breach of the Guaranteed Workshare Provision, unrecovered fixed costs, the calculation was not obvious on the face of the SAL Subcontract but was explained in an exhibit to the Shee Atiká Plaintiffs' motion for partial summary judgment. (JA 738-40; SUMF ¶¶ 47-51).

26

Court to use extrinsic evidence to vary the express terms of the SAL Subcontract, much less resolve issues of fact that were both disputed and immaterial. Had the District Court merely interpreted the contract as written—rather than redraft its provisions for the benefit of GLS long after the fact—the District Court should and would have concluded that GLS breached each of the three contract provisions at issue.

### 2.    The undisputed material facts establish that GLS breached the Guaranteed Workshare Provision.

As drafted by GLS, the Guaranteed Workshare Provision obligated GLS to provide SAL with work sufficient to equal 15% of the total revenue that GLS received under the Prime Contract during the term of the SAL Subcontract, which ended December 5, 2012. (JA 639; JA 60-61, 68; SUMF ¶¶ 1, 6). The total revenue that GLS received during the term of the Prime Contract, excluding award fees, was $2,197,242,065.87. (JA 646; SUMF ¶ 38). To comply with its contractual obligation to provide SAL with work equal to 15% of that figure, GLS would have had to assign subcontract work to SAL in the aggregate amount of $329,586,310. (JA 646; SUMF ¶ 39). It is undisputed that GLS did not do so. Rather, SAL's revenues from the SAL Subcontract were only $287,048,946. (JA 646; SUMF ¶ 40). SAL's damages resulting from the $42,537,364 shortfall are easily calculable from the plain language of the SAL Subcontract. These damages for breach of the Guaranteed Workshare Provision are—based on GLS's

27

interrogatory answers and GLS's December 18, 2013 document production—$3,799,572. (JA 647-48; SUMF ¶¶ 46, 51).

**3.     The undisputed material facts establish that
GLS breached the Award Fee Provision.**

The Prime Contract entitled GLS to a fixed fee while also affording GLS the opportunity—in the discretion of the government—to earn an award fee. Like the Prime Contract, the SAL Subcontract—as drafted by GLS and as signed by the parties—provided for both a fixed fee and an award fee. The Award Fee Provision entitled SAL to a pro rata share of any award fees that GLS received in connection with the performance of the Prime Contract. (SUMF ¶ 22). During the term of the SAL Subcontract, GLS in fact received the highest possible level of award fees on the Prime Contract. (JA 700; GLS Admission No. 96)[18]. The aggregate amount of the award fees that GLS received is $118,052,087.24. (JA 643; SUMF ¶ 23). SAL's pro rata share (15%) of the award fees that GLS received is $17,707,813.09. (JA 648; SUMF ¶ 53). It is undisputed that GLS did not share any of these award fee revenues with SAL. (JA 643; SUMF ¶ 24).

**4.     The undisputed material facts established that
GLS breached the Prompt Payment Provision.**

---

[18] Although not material to resolution of The Shee Atiká Plaintiffs' breach of contract claim, it is undisputed that SAL was instrumental in helping GLS secure these award fees. (JA 700-01; GLS Admission No. 97).

As a small, disadvantaged business, SAL's very survival would have been threatened had it not managed to have included in the SAL Subcontract the verbiage in Article XIV referred to as the "Prompt Payment Provisions." The Prompt Payment Provision obligated GLS to pay SAL's invoices within ten (10) days of receiving payment from the U.S. Army or within sixty (60) days of receiving an "acceptable" invoice from SAL. (SUMF ¶ 26). The same Article XIV of the SAL Subcontract contained a "Prompt Invoice Review Provision" requiring GLS to make a determination as to acceptability of SAL's invoices within five (5) calendar days. (SUMF ¶ 103). The Shee Atiká Plaintiffs' claims for breach of the Prompt Payment Provisions related to invoices from SAL in the aggregate amount of $5,373,289 that GLS had initially paid, GLS later engaged in self-help by unilaterally taking a deduction from unrelated invoices because the Defense Contracting Auditing Agency ("DCAA") had *questioned* certain costs in that aggregate amount. (SUMF ¶ 36). The costs that DCAA questioned were never the subject of an actual audit, much less disallowed. Although GLS's obligation to make payment to SAL was not contingent upon resolution of this issue, SAL was able to substantiate at least $3,717,522 of the costs in question and submitted a Certified Claim in that amount. (JA 645, 706; SUMF ¶ 33). Under the plain language of the Prompt Payment and Invoice Review Provisions, GLS was obligated to pay at least the amount of SAL's Certified Claim. As a matter of law,

29

the undisputed facts thus establish that SAL's damages for breach of the Prompt Payment and Invoice Review Provisions are no less than $3,717,522 (the amount of the Certified Claim).

## II. THE DISTRICT COURT'S INTERPRETATION OF THE GUARANTEED WORKSHARE PROVISION WAS INCORRECT.

The District Court improperly found that GLS did not materially breach the Guaranteed Workshare Provision despite the numerous undisputed facts in support of such a finding. The District Court apparently reached this conclusion by ignoring GLS's conduct and instead making the demonstrably incorrect finding that SAL breached the SAL Subcontract by declining to accept additional task orders that it had no contractual obligation to take. As a matter of law, SAL's performance in June 2012 was legally immaterial—*i.e.*, not outcome determinative—because GLS had previously materially breached the SAL Subcontract. The "factual" basis for the District Court's finding of breach by SAL—SAL's dissolution (JA 1852-53)—is not material, did not affect its ability to perform, and is not the reason it refused certain work toward the end of the SAL Subcontract. As the emails cited by GLS and Judge Brinkema show, SAL did not cease performance on any of its pre-existing task orders. (JA 1057-66). Rather, SAL merely declined to extend the task orders for two reasons. First, these task orders involved work that SAL had no contractual obligation to undertake. Second, SAL asserted that it could mitigate its damages only by not accepting this

30

new work because GLS was offering such a small volume of work that SAL could perform it only at a loss. (JA 919, 21; AUMF ¶¶ 9, 16-19). (*See, e.g.*, JA 955-56). As a matter of law, whether SAL accepted these task orders was not material because—not only were they outside the proper scope of the SAL Subcontract—it was at that point mathematically impossible for GLS to fulfill its obligations under the Guaranteed Workshare Provision. Even if SAL had been offered 100 percent of the remaining "shares," under the Prime Contract, GLS would have fallen far short of its 15% obligation. (JA 921; JA 1095; AUMF ¶¶ 17-19)[19]. GLS simply did not have the work to offer.

### A.    GLS Materially Breached the SAL Subcontract Before SAL Declined to Accept New Task Orders.

"A material breach of contract occurs if a party fails to do something that [it] is bound to do according to the contract and is so important and central to the contract that the failure defeats the very purpose of the contract." *Elite Entm't, Inc. v. Khela Bros. Entm't, Inc.*, 396 F. Supp. 2d 680, 693 (E.D. Va. 2005) (citing *Horton v. Horton*, 254 Va. 111, 115 (1997) (not granting power of attorney as required by the contract was a material breach when purpose of the contract was to

---

[19] The difference between what SAL actually received and what SAL needed to receive to meet its 15% Workshare was $42,527,364. (JA 646). Between June 2012 (the date when SAL turned down work consisting of CAT II and CAT III work) and December 2012 (the last day of subcontract performance), GLS received a total of only $31,369,408 under the Prime Contract. (JA 921, 1095).

31

facilitate sales through the power of attorney)). In other words, a material breach is a breach that "goes to the 'root' of the transaction." *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 154 (2001). As a matter of Virginia law, a material breach by GLS excused SAL from performance. *Horton*, 254 Va. at 116. Moreover, SAL was not required to immediately terminate the contract in response to GLS's material breach. Rather, SAL was entitled—out of prudence and fairness—to afford GLS an opportunity to cure the breach. *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 09cv863, 2009 U.S. Dist. LEXIS 109185, at *13 (E.D. Va. Nov. 23, 2009) (citing II Farnsworth on Contracts § 8.18). That is exactly what SAL did, as evidenced by the January 16, 2012 notice. (JA 645; SUMF ¶ 37).

The Guaranteed Workshare Provision specified that SAL was entitled to "15% of the services to be provided under the Prime Contract." (JA 60, 68). Put simply, SAL bargained for and received a contractual guarantee of work sufficient to equal a 15% share of GLS's total revenue of the Prime Contract. As is clear on its face, this provision was bargained for by SAL, essential to the IDIQ SAL Subcontract, and directly related to its profitability for SAL. (JA 366-67). "The minimum of amount work promised in an IDIQ contract is central to the contract and at least that much work is required to be given." *Travel Ctr. v. Barram*, 236 F.3d 1316, 1319 (Fed. Cir. 2001).

32

In the case of the SAL Subcontract, the importance of the Guaranteed Workshare Provision is reflected in, *inter alia*, the provision requiring GLS to submit Monthly Status Reports "to enable Subcontractor to determine GLS's compliance with" the Guaranteed Workshare Provision. (JA 640-41; SUMF ¶ 8). Only after multiple requests from SAL to obtain information about the revenue that GLS had received from the Prime Contract did GLS start providing SAL with Monthly Status Reports in October 2009. (JA 641; SUMF ¶ 10). This breach was even recognized and noted by the District Court. (JA 1851-52). Every Monthly Status Report sent by GLS to SAL—to the extent that it showed the total revenue received by GLS under the Prime Contract at that point—showed that the work assigned to SAL never even exceeded 10% of Total GLS Revenue. (JA 641; SUMF ¶ 11).[20]

On August 12, 2011, GLS materially breached the SAL Subcontract by unilaterally reinterpreting the way SAL's Workshare was to be calculated from that point forward. The position set forth in GLS's Workshare Repudiation Letter is wholly unsupported by the SAL Subcontract, the course of dealing between the

---

[20] Although not material to The Shee Atiká Plaintiffs' breach of contract claim, it is telling that SAL—as part of an ongoing effort to work under the SAL Subcontract in good faith, mitigate its losses, and hopefully improve its Workshare situation—even offered to take certain work from GLS that it was not obligated to take under the SAL Subcontract (including non-linguist work). (JA 697; GLS Admission No. 84). While GLS did assign certain non-linguist work to SAL, in other instances, GLS turned down SAL's offers. (JA 344).

parties, and common sense. GLS's Workshare Repudiation Letter provided an unequivocal announcement by GLS that it had no intention of abiding by the Guaranteed Workshare Provision. And in this case, GLS's subsequent actions spoke even louder than its words. It is undisputed that GLS did not provide SAL with another Monthly Status Report for the duration of the SAL Subcontract. While GLS's motives are ultimately immaterial, it is quite clear that GLS saw its commercial future in the Successor Prime Contract. The sequence of events suggests that GLS made the business decision that it no longer needed to comply with its obligations to SAL under the SAL Subcontract.

Despite the strained attempt of the District Court to credit GLS's position on this issue (JA 1858-59), the SAL Subcontract could not be clearer on this issue. Nowhere in the SAL Subcontract does it reference limiting the total GLS revenue upon which SAL's Workshare was to be calculated to only the portion related to linguist services. To the contrary, the parties specifically modified the SAL Subcontract in February 18, 2008 to increase SAL's Workshare to 15% and to remove any reference to "linguist services." (JA 366-67). Similarly, GLS did, in fact, provide SAL with non-linguist positions under the SAL Subcontract. (JA 697; GLS Admission No. 85). Moreover, the contract ceiling value of the SAL Subcontract $696,750,000.00 is exactly equal to 15% of the Prime Contract's Contract Ceiling Value of $4,645,000,000.00. (JA 640; SUMF ¶ 5). In short,

SAL's Workshare calculation was intended to compare the work awarded under the SAL Subcontract against GLS's total revenue from the Prime Contract. In addition to the plain language of the contract, the following undisputed facts buttress this conclusion:

1. The Workshare Repudiation Letter itself acknowledged a change from what was then "the current approach to work share measurement." (JA 642; SUMF ¶ 16).

2. All of the prior Monthly Status Reports reflected Total GLS Revenue—not just revenue related to linguist services—for the purpose of evaluating SAL's Workshare. (JA 641-42; SUMF ¶¶ 13-14).

3. A February 9, 2009 email from Mr. Michael Shingledecker, the Director of Procurement at GLS and an "Authorized Negotiator" pursuant to Article XVI of the SAL Subcontract at that time stated: "As you are no doubt aware, your subcontract contains language requiring your company to receive a certain percentage of the *total value* of the [Prime Contract] (work share)." (JA 695; GLS Admission No. 78,79) (emphasis added).

The foregoing facts show that, before sending the Workshare Repudiation Letter, GLS and SAL shared a common understanding of the Guaranteed Workshare Provision that was consistent with its plain language. After securing the Successor Prime Contract, however, GLS no longer needed SAL and "adjusted" its interpretation of the SAL Subcontract accordingly. Despite SAL's repeated attempts to resolve these issues in good faith, GLS did not recant its unilaterally dictated interpretation. Instead, because the "adjustment" allowed GLS to allocate less work to SAL, GLS began giving SAL less work and—more

35

importantly—work that SAL was not obligated to accept under the terms of the SAL Subcontract.[21]

The material facts related to the Guaranteed Workshare Provision and GLS's breach of that provision are not in dispute. GLS's unilateral modification of a provision at the heart of the SAL Subcontract constitutes a material breach that excused SAL from further performance. *See Barron v. NetVersant-N. Va., Inc.*, 68 Va. Cir. 247, 253 (Va. Cir. Ct. 2005) (unilateral modification of a contract to, among other things, reduce salary and remove employment guarantees, amounted to a material breach); *Horton*, 254 Va. at 116.

### B.    The District Court Improperly Found That SAL Declined to Take on New Work Because of its Subsequent Dissolution.

The District Court incorrectly found that the SAL's dissolution was the reason it declined to take on new work from GLS. The "final []" and "most important []" fact cited by the District Court in support of its findings related to the Guaranteed Workshare Provision was that SAL "was not refusing work because of the category of linguists involved, but because Shee Atiká was winding down its work as a result of its dissolution earlier that year." (JA 1860). This finding is both incorrect and immaterial. The District Court's finding is incorrect because it is undisputed that SAL's dissolution did not affect its ability to perform. As SAL

---

[21] Pursuant to the SAL Subcontract "[i]n no event shall [SAL] be required to employ CAT II or CAT III personnel." (JA 68).

4831-1672-1184.2

explained in writing on January 30, 2012, "SAL very much remains in business to complete our contracts despite SAL's 'dissolution' under Alaska state law. There is no successor to SAL, and SAL remains a legal entity until SAL's existing contracts are fully performed by both parties." (JA 1063; JA 920; AUMF ¶ 14). SAL further explained:

> SAL is able to modify its contract with GLS to the extent that SAL is not extending the duration or overall scope of SAL's performance, as SAL is now in "winding up" mode. SAL IS able to continue to do those things that are necessary to perform the contract, and that includes making modifications that are ultimately aimed at completing our performance and resolving ongoing issues in an efficient and mutually agreeable manner. Likewise, SAL will have full power and authority to enter whatever legal documents are necessary to resolve the Form 1 and workshare claims, as those are a part of the ultimate wind up of SAL.

(JA 1061-62) (emphasis in original). GLS's Ms. Comer eventually realized that her attempts to use SAL's dissolution as a way to avoid GLS's contractual obligations were in vain. In fact, she used the often paraphrased quote from Mark Twain to summarize the situation: "The reports of my death have been greatly exaggerated." (*Id.*)

The District Court's finding is also immaterial for at least two reasons. First, *why* SAL refused to take new task orders is not outcome-determinative. It simply has no bearing on *whether* SAL was obligated to take on such task orders in the first place. Second, all of the task orders that SAL refused consisted exclusively or

primarily of CAT II and CAT III linguist work which—under the express language of the SAL Subcontract—SAL was not obligated to take.  Thus, contrary to the District Court's findings, SAL did not breach the SAL Subcontract in June 2012. The District Court's conclusion, however, relied upon the premise that SAL was obligated to accept work requiring CAT II and CAT III linguists because it had previously accepted some such work.  (JA 1860-61).  This is incorrect as a matter of law.  Such a conclusion impermissibly permits unilateral amendment of the SAL Subcontract through course of dealing despite explicit language in the SAL subcontract requiring all amendments to be in writing.  *See Powell Mountain Joint Venture v. Moore*, 248 Va. 63, 66-67 (Va. 1994) (finding the parties did not modify their contract through course of dealing because there was no "express mutual agreement of the parties" to do so); *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68 (Va. 1983) ("[T]he circumstances surrounding the conduct of the parties must be sufficient to support a finding of a 'mutual intention' that the [contract] modification be effective, . . . and such intention must be shown by 'clear, unequivocal and convincing evidence, direct or implied.'").

GLS does not, and cannot, cite evidence indicating that the parties made an "express mutual agreement" to amend the terms of the SAL Subcontract. Moreover,  the District Court's conclusion that SAL was obligated to accept work requiring CAT II and CAT III linguists because it had not previously complained

38

about having to do such work (JA 1861) is not supported by any citation to the record, is contrary to the record, and in any event is not material. The language of the contract expressly states that "in no event" would SAL "be required to employ CAT II or CAT III linguists" (JA 68). The District Court's finding that the parties' course of dealing somehow amended "in no event" to "in every event" is a clear legal error.

### C. The "Last Day of Subcontract Performance" Is Not Defined in the SAL Subcontract, Which Ended in December 2012.

The District Court's Memorandum Opinion notes that, with respect to the Guaranteed Workshare Provision, the SAL Subcontract states that "[t]he fulfillment of this requirement shall be evaluated on the last day of Subcontract performance." (JA 1860). According to the District Court, "[t]hat day never came owing to Shee Atiká's breach of the Subcontract by declining to take on any new work as of June 2012." (*Id.*) The District Court ignored, however, that the "last day of Subcontract performance" is not a defined term. (*See generally* JA 56-152). The District Court also ignored the undisputed fact that the SAL Subcontract was explicitly amended to identify December 5, 2012 as "the term of this subcontract" and—despite eight subsequent modifications—the term of the SAL Subcontract

39

was never extended beyond this date. (JA 639; SUMF ¶ 1; *see, e.g.,* JA 385-86, 396-97).[22]

Despite this evidence to the contrary—and the immateriality of the issue—the District Court improperly found that the SAL Subcontract's end date was extended to July 3, 2013 because the Prime Contract was extended to that date. (JA 1865). That finding, however, is contrary to Article XIII of the SAL Subcontract. (*See* JA 71). Article XIII required that, for the term of the SAL Subcontract term to be extended, GLS would need to "provide [SAL] with notice of intent to exercise an option and notice of exercise of an option to the extent provided under the prime contract." (*Id.*). The parties had previously extended the end of the SAL Subcontract by signed modifications on more than one occasion. (JA 385-86, 396-97). Yet, GLS and SAL never signed a modification to extend the term of the contract beyond December 5, 2012. (JA 639; SUMF ¶ 1).

The District Court apparently believed that the last day of contract performance was relevant to the extent that it related to SAL's willingness and ability to perform and GLS's capability of providing SAL its contractually required Workshare. (*See* JA 1860). The District Court's error in contract interpretation, however, skewed its ultimate conclusion in at least two ways. First, SAL

---

[22] Given that GLS had already materially breached the contract, and SAL no longer had an obligation to continue performance under the contract, this issue is ultimately immaterial.

communicated to GLS its intent to fully perform throughout the life of the contract on multiple occasions and in fact did not dissolve until two months after the term of the SAL Subcontract had ended.  (JA 920; AUMF ¶¶ 14, 15).  Second, both the volume of work available to GLS under the Prime Contract and GLS's internal projection of SAL's ultimate Workshare make clear that SAL was not capable of achieving a 15% Workshare before the end of the contract term.

In short, GLS had already materially breached the terms of the SAL Subcontract by the time SAL stopped performing in June 2012.  Therefore, SAL was excused from future performance as a matter of law.  *Horton*, 254 Va. at 116.  However, to the extent the District Court found that GLS's unilateral change to the Guaranteed Workshare Provision did not constitute a material breach, it improperly and incorrectly found that SAL ceased performance because of its dissolution and could have met its Workshare if it accepted work it was not obligated to take and performed beyond the explicit term of the SAL Subcontract.  This finding is contrary to certain facts that—while immaterial—are undisputed.

## III.    IN EFFECT, THE DISTRICT COURT AMENDED THE SAL SUBCONTRACT TO DELETE THE AWARD FEE PROVISION.

In its analysis of the Award Fee Provision, the District Court completely ignored the language of the SAL Subcontract and made improper factual findings.  It is undisputed that the Award Fee Provision—although not a negotiated term—was part of the Statement of Work contained in the SAL Subcontract that both

41

parties signed. (JA 643; SUMF ¶ 22). During the course of performance, the Statement of Work was modified six times. (JA 366-402). (Modifications 3, 4, 5, 9, 20, and 21). In the ordinary course of business, the parties never deleted or otherwise modified the Award Fee Provision. That did not happen until the District Court issued its Memorandum Opinion.

The District Court improperly found that the plain meaning of the Award Fee Provision was changed by the parties' course of dealing. Again, it is inappropriate and contrary to Virginia law to analyze the parties' course of dealing to interpret an unambiguous contract. *Powell Mountain Joint Venture*, 248 Va. at 66-67. Moreover, because the SAL Subcontract "is plain and unambiguous in its terms," Virginia law requires that it "be given full effect." *McLean House v. Maichak*, 231 Va. 347, 344 S.E. 2d 889, 890 (Va. 1986); *Gordonsville Energy v. Virginia Elec. & Power Co.*, 257 Va. 344, 512 S.E. 2d 811, 817 (Va. 1999) ("when contract terms are clear and unambiguous, the words used by the parties must be given their plain and ordinary meanings").

One of the principal facts upon which the District Court based its decision—whether SAL invoiced for an award fee—is immaterial. The District Court's *ex post facto* amendment of the SAL Subcontract is clear that it cannot be amended except in writing. (JA 77, 78). Therefore, the fact that SAL never invoiced for an award fee is not sufficient to delete this provision from the SAL

42

Subcontract. On its face, it is especially troubling because GLS never provided notice to SAL of the award fee on the Monthly Status Reports to SAL as it apparently did to other subcontractors.

If the District Court disagreed with the parties that the SAL Subcontract was unambiguous, it was inappropriate for the District Court to make a factual finding on this issue at the summary judgment stage. *See Banca Del Sempione v. Provident Bank*, 75 F.3d 951, 959 ("An ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact. In this event, summary judgment is inappropriate") (citing *World-Wide Rights Ltd. Partnership v. Combe, Inc.*, 955 F.2d 242, 245 (4th Cir. 1992)). Therefore, the only evidence necessary to interpret the meaning of the contract language is the SAL Subcontract itself.

In an effort to bolster its conclusion that SAL was not entitled to payment under the Award Fee Provision, the District Court claimed that the cost plus fixed fee nature of the SAL Subcontract is inconsistent with an award fee. (Mem. Op. at ___). However, that ignores the fact that the Prime Contract itself contemplated an award fee even though it also was a cost plus fixed fee contract. (SUMF ¶___/AUMF ¶___). This undisputed fact is proof positive that the two types of fees—fixed fees and award fees—are not inconsistent with one another. The District Court acknowledges that another subcontractor, L-3, received both types

43

of fees. (Mem. Op. at 26). Nevertheless, the Court proceeded to treat the Award Fee Provision as if it could not be reconciled with the fact that the SAL Subcontract was nominally called a cost plus fixed fee contract. This was legal error. The two provisions can and should be read together.

## IV.   THE DISTRICT COURT'S INTERPRETATION OF THE PROMPT PAYMENT PROVISIONS IS INCORRECT AS A MATTER OF LAW.

The District Court's interpretation of the Prompt Payment Provisions was incorrect for four crucial reasons. First, the District Court violated basic principles of contract interpretation by allowing the FAR "flowdown" provision to trump the Prompt Payment Provisions. (*See* JA 1866-72). This was contrary to the plain language of the SAL Subcontract, which expressly states that the "Articles" (of which the Prompt Payment Provision is one) take precedence over the "Additional Contract Provisions" which take precedence over the "Special Provisions" (of which the FAR "flowdown" is one). (JA 61).

Second, the FAR "flowdown" provision is inapplicable because it is undisputed that there never was any "audit" by either DCAA or GLS. The District Court's references to a DCAA audit (JA 1854, 1867-69) are incorrect. It is indisputable that there never was any DCAA "audit." (JA 939). A DCAA audit and a DCAA Form 1 are simply not the same things. (JA 1035). Rather than an audit, there was merely a DCAA Form 1 questioning whether certain costs were allowable. (JA 644; SUMF ¶ 28). Additionally, the District Court's statement that

44

the Army rejected certain costs deemed not allowable is incorrect. Rather, the Army never reached that issue because GLS refused to sponsor SAL's Certified Claim and SAL does not have standing to bring the challenge itself before the DCAA. At this point, there has never been a determination by anyone—not GLS, not DCAA, and not the District Court—that the costs at issue were not allowable. The issue of the allowability of the costs was clearly disputed. That was not a dispute that could be resolved by the District Court—even by way of a jury trial, much less on summary judgment. In any event, that issue was not dispositive of liability. By proceeding to make an improper ruling on this disputed issue, SAL has no recourse to recover any portion of this money. That is certainly legal error.

Third, in violation of contract interpretation rules that require contract provisions to be read together so that all provisions are given meaning, the District Court's interpretation of GLS's right to offset pursuant to Article XXVI was far too broad and improperly ignored the language of the Prompt Payment Provisions. While the offset language is admittedly broadly worded, it was never intended to modify the payment terms. This is clear from reading the contract as a whole. *See Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 392 (Va. 2012). The provision was intended to give GLS the right to offset liability caused by conduct of SAL that was not already addressed by other provisions in the contract.

45

Instead, the Court read the offset provision in such a way that it effectively deletes the Prompt Payment Provisions. Such a reading is clear legal error.

Fourth and finally, the District Court's conclusion that the credit issued by SAL represents a concession that GLS was entitled to at least some recoupment is incorrect both as a matter of law and in fact. It is incorrect as a matter of law because, yet again, the District Court allowed the SAL Subcontract to be amended by course of dealing. Like every such government contract, invoices under the SAL Subcontract were issued initially using interim rates for indirect costs before the later recalculation of final indirect rates pursuant to IAW FAR 42.705.

## V. GLS BREACHED ITS DUTY OF GOOD FAITH AND FAIR DEALING BY REFUSING TO SPONSOR SAL'S DCAA CLAIM.

When it breached the Prompt Payment Provisions, GLS also breached its duty of good faith and fair dealing to SAL by refusing to sponsor SAL's Certified Claim before DCAA. The District Court erred as a matter of law by ignoring this duty, which is both an express and an implied term of the SAL Subcontract, and by ignoring the facts relevant to this claim. While relevant to showing the pretextual nature of GLS's arguments, evidence of GLS's bad faith is not material to finding a breach of the Prompt Payment Provisions by GLS. Such evidence is certainly relevant and material, however, to rebutting GLS's claim that it is entitled to summary judgment on this issue. If the District Court had agreed with The Shee Atiká Plaintiffs' interpretation of the Award Fee Provision, the issue of GLS's bad

46

faith would have been moot and the evidence immaterial. This evidence was certainly material, however, in that it precluded summary dismissal of The Shee Atiká Plaintiffs' claims for breach of the Award Fee Provisions.

By withholding funds from SAL rather than submitting SAL's Certified Claim to the government, GLS also violated its express obligation "to make a good faith effort to mutually resolve any dispute as quickly as possible"[23] (JA 76) along with the implied covenant of good faith and fair dealing.

"In Virginia, every contract contains an implied covenant of good faith and fair dealing." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). The elements of a claim for breach of an implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) a breach of the implied covenant. *Id.* The implied covenant is breached when a party to a contract has discretion in its performance of a certain aspect of the contract and proceeds to act arbitrarily and unfairly in its exercise of that discretion. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 542 (4th Cir. 1998). In this case, GLS had the discretion to sponsor SAL's claim against the government, knowing full well that SAL could not directly file a claim with the government to demand payment. (JA 645; SUMF ¶ 30). Yet after SAL

---

[23] FRE 1006 SAL Subcontract Summary at Article XXII. (Compl. Ex. A.)

worked with GLS to substantiate its costs and submitted the Certified Claim to

GLS as required by the SAL Subcontract, GLS refused to sponsor SAL's claim or

otherwise respond to the issues raised in the DCAA Form 1.

The Memorandum Opinion states:

> [b]ecause the Court finds that GLS's withholding of the $5,373,289 questioned by DCAA from Shee Atiká was not a breach of the prompt payment provision, it need not resolve the parties' dispute as to the sufficiency of the documentation supporting Shee Atiká's certified claim or decide whether GLS's decision not to submit the claim to the Army was made in bad faith.

(JA 1871). The District Court appears to be saying that no duty of good faith and

fair dealing attaches to the Prompt Payment Provision. At the time it received the

DCAA Form 1, GLS had already paid SAL the amount in question. Thereafter,

SAL immediately began to work together with GLS in a good faith effort to

resolve the matter with DCAA. As part of this effort, SAL hired Darrell Oyer, one

of the country's leading experts on government cost accounting and cost

allowability matters. Mr. Oyer and SAL addressed each item identified in the

DCAA Form 1. (*See, e.g.*, JA 1096-1198). SAL and Mr. Oyer worked with GLS

and prepared a ***joint*** presentation to DCAA by SAL and GLS. (*Id.*) At the same

time, SAL also provided GLS with a large amount of data and analysis supporting

the specific cost items that had been questioned by DCAA. On June 30, 2010,

SAL and GLS met with DCAA in Fort Worth, Texas to present DCAA with a ***joint***

48

explanation of why $4,048,284 from the Form 1 constituted allowable costs.[24] Despite the productive meeting, GLS withheld approximately $1 million in funds from SAL on unrelated invoices rather than pursue a claim with DCAA at that point. SAL objected to GLS withholding funds, but still continued to work in good faith with GLS in an attempt to reach a resolution with DCAA that would settle the issue of questioned costs. (SUMF ¶___).

GLS had a different tactic, though. GLS intended to use the withheld funds as leverage to get SAL to agree to a reduction in its Guaranteed Workshare. In an internal GLS email, Ms. Anne Street wrote: "If we wanted to reduce SAL's share for personal reasons, we could always use the Form 1 issue to negotiate for a lower share than they currently have." (JA 1020). SAL refused to submit to this bad faith negotiation tactic.

At the same time that GLS was withholding funds from SAL that were questioned on a DCAA Form 1, GLS itself was dealing with its own DCAA Form 1 issues. Rather than dragging its feet as it did with SAL, GLS immediately contacted DCAA and dealt with the issues. (JA 1228-31). Interestingly, GLS complained that DCAA's findings in the Form 1s issued to it were flawed in many

---

[24] GLS has since lost this data (JA 1226), and it has used the supposed lack of supporting data as its primary reason for not sponsoring SAL's claim to DCAA without major changes. (*See* JA 1219-22). This argument is nothing more than mere pretense, though, and yet another example of GLS's bad faith in its dealings with SAL.

of the ways that SAL had been stating from the very beginning. (JA 1035: "DCAA has yet to issue an audit report supporting its Form 1." JA 1052: "DCAA's Conclusions Demonstrate a Questionable Audit Approach.")).

In January 2012, GLS unilaterally decided to withhold the entire amount of costs questioned by DCAA. SAL again objected to this action taken by GLS, yet it continued to make good faith attempts to work with GLS and further substantiated its costs in a Certified Claim (JA 207-68) that could be submitted to the government by GLS. On March 28, 2012, SAL submitted its Certified Claim to GLS for submission to the government. (*Id.*). However, GLS never submitted SAL's Certified Claim to the government. More concerned with its own Form 1 disputes—especially since it had already unilaterally withheld payment from SAL—GLS determined that it was "not the right time to file a claim." (JA 1204).

Submission of SAL's Certified Claim was not, however, a prerequisite for GLS's contractual obligation to make payment. GLS never disputed SAL's $3.7 million Certified Claim as required by the Prompt Payment Provision. GLS was therefore obligated to make payment regardless of whether, when, and under what conditions GLS submitted the Certified Claim.

Now, GLS insists that it did offer to sponsor the claim nearly two months after SAL had submitted it to GLS. Besides being immaterial, this contention is at best misleading. Nearly two years after receiving supporting documents from SAL

50

before the June 2010 meeting with DCAA, at which time SAL and GLS made a

joint presentation, GLS said that it would sponsor SAL's claim to the government

if SAL agreed to remove from the claim the majority of the costs at issue.  (JA

1219-22).[25]  GLS's argument that it could not validly certify the certified claim is

yet again more *ex post facto* pretext.  While there is no dispute that GLS would

have to certify the claim to submit it to INSCOM, GLS in fact had documentation

substantiating the claim since June 2010.  GLS had participated in a joint meeting

with DCAA on the same issues.  GLS apparently lost much of that data (JA 1226),

but had no reason to doubt its validity.  For GLS to claim that it feared civil and

criminal penalties if it signed the Certified Claim is ridiculous.  Mr. Oyer (who has

dealt with DCAA issues for many years following his tenure as Deputy Director of

DCAA) testified that he believed the amount of supporting documentation that

went along with the certified claim was sufficient, and that it is quite common to

only send the most pertinent supporting items to DCAA, while making other

---

[25] Paragraph 62 of GLS's SUMF (JA 890) erroneously claims that Mr. Oyer acknowledged that the Certified Claim lacked information to substantiate its claim. Mr. Oyer acknowledged that there was additional information related to all of the topics summarized in the Certified Claim—as would be expected—however, he stated that he was comfortable with the amount of supporting documentation in the certified claim and that it is quite common to only send the most pertinent supporting items to DCAA, while making other documents available on an audit, and that the materials supplied to GLS with the Certified Claim constituted the most pertinent data.  (JA 1247-48).  Moreover, Mr. Oyer stated that he had no reason to doubt the information in the memorandum supplied by Ken Cameron, which substantiated SAL's Certified Claim.  (JA 1248-49).

documents available on an audit, and that the materials supplied to GLS with the Certified Claim constituted the most pertinent data. (JA 1247-48). And, of course, GLS knew that SAL's president had signed a certification in support of the claim. Additionally, GLS would not agree to sponsor the claim unless SAL agreed to waive GLS's liability related to the claim. This was an issue SAL had already disputed with GLS pursuant to the disputes provision of the SAL Subcontract. (JA 1232-34). By this point, it was quite clear that GLS's position was yet again a mere pretense, and SAL would not and could not agree to those terms.

To the extent the District Court attempts to bolster its decision in *dicta*, it relies upon cherry-picked language from Darrell Oyer's deposition which is contradicted by some of his own testimony. Even if Oyer said that "not ***all*** relevant documentation was submitted" (JA 1871) (emphasis added), that does not mean that the documentation was insufficient. (*See* JA 1247-48). Of course, Mr. Oyer's belief as to whether the documentation was adequate is not dispositive. To the extent this issue is material, however, the District Court erred by resolving this dispute on summary judgment.

On appeal, the Fourth Circuit can and should make a determination as a matter of law that GLS—having previously not objected to either the amount of SAL's Certified Claim or the adequacy of the back-up documentation—violated the implied duty of good faith and fair dealing by later claiming not to have

52

documentation that SAL had previously submitted and by refusing to sponsor SAL's Certified Claim.

## CONCLUSION

In this case, justice for The Shee Atiká Plaintiffs was both delayed and denied. The subject matter of the SAL Subcontract was admittedly dry. But if there were disputed issues of material fact to be resolved, it was not appropriate for the District Court to decide any factual disputes rather than submit them to the jury. With respect to The Shee Atiká Plaintiffs' breach of contract claim—to which the scope of this appeal is confined—there were no disputed issues of material fact that needed to be resolved. The undisputed material facts, including the plain language of the SAL Subcontract, entitled The Shee Atiká Plaintiffs to judgment on their breach of contract claim as a matter of law. By ignoring the plain language of the SAL Subcontract, and by permitting the use of extrinsic evidence to vary its terms, the District Court committed clear error. This error can and should be corrected by this Court by reversal of the judgment below and entry of summary judgment in favor of The Shee Atiká Plaintiffs on their claim for breach of contract.

## REQUEST FOR ORAL ARGUMENT

The Shee Atiká Plaintiffs-Appellants respectfully request oral argument on the issues raised by this appeal.

Date: October 28, 2014                    Respectfully submitted,


By:    _/s/ Michael J. Lockerby_____
Michael J. Lockerby (VSB No. 24003)
Brian J. Kapatkin (VSB No. 75061)
Erik F. Benny (VSB No. 83650)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W. Suite 600
Washington, D.C. 20007-5109
(202) 945-6079 (Telephone)
(202) 672-5399 (Facsimile)
mlockerby@foley.com
bkapatkin@foley.com
ebenny@foley.com

*Counsel for Appellants,*
*The Shee Atiká Plaintiffs*

54

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 13,233 words. This certificate was prepared in reliance on the word-count function of Microsoft Word 2010.

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), this brief was formatted in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 14-point type font.

/s/ Michael J. Lockerby

Michael J. Lockerby

4831-1672-1184.2

**Certificate of Service**

I certify on this 28th day of October 2014, the foregoing THE SHEE ATIKÁ

PLAINTIFFS' OPENING BRIEF was served counsel of record for Defendant-

Appellee, GLS, through the CM/ECF system:

>Jennifer A. Mahar, Esq.
>Edmund M. Amorosi, Esq.
>Todd Garland, Esq.
>Zachary Prince, Esq.
>SMITH PACHTER MCWHORTER, PLC
>8000 Towers Crescent Drive, Suite 900
>Vienna, Virginia 22182
>Telephone: (703) 847-6300
>Facsimile: (703) 847-6312
>Email: jmahar@smithpachter.com
>Email: eamorosi@smithpachter.com
>Email: tgarland@smithpachter.com
>Email: zprince@smithpachter.com

/s/ Michael J. Lockerby
Michael J. Lockerby

4831-1672-1184.2